In the Matter of Warren Henry
TETZLAFF, Debtor.

Gordon G. PARO, Plaintiff,

v.

Warren H. TETZLAFF, Defendant.

Bankruptcy No. 82–02625.
Adv. No. 82–1493.

United States Bankruptcy Court,
E.D. Wisconsin.

Nov. 9, 1984.

See also 31 B.R. 560.

Elizabeth A. Orelup, Quarles & Brady, Milwaukee, Wis., for plaintiff.

Thomas D. Kuehl, Milwaukee, Wis., for defendant.

C.N. CLEVERT, Bankruptcy Judge.

The question before the court is whether a nondischargeable debt exists between two former business associates, Warren Tetzlaff (Tetzlaff), the debtor and defendant in this case, and Gordon Paro (Paro), the plaintiff. Throughout the course of these proceedings, Paro has asserted two theories on which he bases his claim for nondischargeability. In count I of the complaint, Paro alleges that Tetzlaff's false financial statement, regarding his ownership of certain property, induced his participation in a business venture with Tetzlaff. Thus, Paro claims that he is entitled to recover, pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B), $55,900 spent as a result of doing business with Tetzlaff.

Count II asks that the debt be declared nondischargeable under 11 U.S.C. § 523(a)(4), due to Tetzlaff's defalcation while acting as a fiduciary for Modular's suppliers and contractors, pursuant to WIS.STAT. § 779.02(5), and that Paro be subrogated to those claims he has paid or will pay in the future.

Based on the record in this case, as well as on the arguments of counsel, the following shall constitute the court's findings of

fact and conclusions of law in accordance with Bankruptcy Rule 7052.

## FACTS

The plaintiff, Gordon G. Paro, and the debtor/defendant, Warren H. Tetzlaff, are former business associates who met in approximately 1949. Their business association began in mid 1978 when Tetzlaff approached Paro and suggested that they go into business selling small prefabricated metal buildings. After considerable discussion, Paro agreed to join the venture. According to Paro, sometime in early 1979, he and Tetzlaff exchanged written personal financial statements. Tetzlaff denied that this took place. In any event, Paro testified that he was unable to produce Tetzlaff's financial statement at trial because he returned it to Tetzlaff immediately after viewing it. Nonetheless, he stated that he recalled a great deal of the information contained in the financial statement and especially noted that Tetzlaff falsely claimed to have owned an unencumbered half interest in three lots that were valued at $150,000 to $175,000.

Paro also testified that he relied upon the financial statement in making his decision to go into business with Tetzlaff and that Tetzlaff's ownership of the lots was critical to his decision to go into the prefabricated building business because the lots were the only free and clear assets that Tetzlaff owned.

## DISCUSSION

■ It is readily apparent from the testimony in this case that count I is without any factual or legal foundation. Paro testified as follows:

QUESTION: Please tell me about the business connections between you and Mr. Tetzlaff.

PARO: Sometime in the middle to late 1978, Mr. Tetzlaff came to me and proposed getting into business, the selling of small prefabricated type steel buildings that were being produced by a company by the name of Porta-Structure in Appleton, Wisconsin. And after doing some—he had done a lot of research on it and we had a lot of discussions and so forth and seeing the buildings, and how it was built, and so forth.

We agreed that we would get into business for the sale of steel buildings, small to medium-sized steel buildings.

QUESTION: Did you have negotiations prior to deciding to going into business with Mr. Tetzlaff?

PARO: Prior to the mid to late '78?

QUESTION: Yes.

PARO: None.

QUESTION: After the middle to late 1978, did you and Mr. Tetzlaff ever exchange financial information?

PARO: Yes, we did.

QUESTION: Did you ever exchange written financial information?

PARO: Yes.

QUESTION: When did you do that?

PARO: I would say early part of 1979.

QUESTION: Did Mr.—

PARO: For the corporation, before the corporation was incorporated. (Tr. 19–20)

Paro later testified:

QUESTION: Before you mentioned a meeting that occurred between yourself and Mr. Tetzlaff in which you exchanged financial statements; is that correct?

PARO: Yes.

QUESTION: Now, do you recall when that meeting occurred?

PARO: I would say it was early '79.

QUESTION: It was early '79?

PARO: Yes.

QUESTION: Are you sure of that?

PARO: As sure as I can be. (Tr. 64–65)

Following that exchange between Paro and the debtor's attorney, Paro conceded that during his deposition, which was taken eight days prior to trial, he said that he and Tetzlaff exchanged financial statements between two and twelve months prior to incorporating their business. (Tr. 65–66.)

The testimony also disclosed that Paro and Tetzlaff never promised one another that they would use personal assets to fund

their business, as underscored by Paro's answers to his attorney's questions.

> QUESTION: Mr. Paro, did Mr. Tetzlaff ever tell you that his interest in certain commercial lots on South 27th Street was available for use in the business? ...
>
> PARO: I can't say for sure whether he said if we need money, here they are. When it is part of somebody's assets, you assume it can be used. (Tr. 26).

Thus, notwithstanding Tetzlaff's denial that he and Paro exchanged financial statements, the inescapable conclusion that must be drawn from the testimony in this case is that (1) Paro decided to go into business with Tetzlaff in late 1978, prior to ever seeing Tetzlaff's financial statement; and (2) Tetzlaff never represented to Paro that he would use his interest in any particular property to finance their business. Hence, Count I must fail for lack of proof.

After reviewing the evidence at trial and the stipulated facts, the court finds that count II must also be dismissed for failure of proof. In order for Paro to sustain his claim under count II, it was essential that he present evidence that Modular received payments from its customers in trust for its suppliers and that Tetzlaff, as an officer and director of Modular, misapplied those funds contrary to WIS.STAT. § 779.02(5).[1] However, no such evidence was presented.

The following was presented:

(a) Tetzlaff and Paro were officers and directors of Modular.

(b) During the course of its business, Modular purchased goods and materials from third parties, including Inryco, Inc., for use in the construction of buildings.

(c) Modular was obligated under WIS. STAT. § 779.02(5) to retain moneys paid by its customers on each project, in trust for the benefit of its suppliers and subcontractors, until all such claims relating to each project were paid.

(d) Inryco, Inc. commenced a civil action in the Circuit Court for Waukesha County, Wisconsin, against Modular, Tetzlaff and Paro alleging that it had provided materials and labor to Modular as prime contractor, for the construction of a steel building and that Modular failed to pay Inryco from the money it was paid for the job.

(e) C.E. Doyle claimed he was a cement and excavation contractor on a project where Modular was the prime contractor and that Modular failed to pay him for the job even though it had been paid.

(f) Paro settled the Inryco suit prior to trial or any determination of liability, by paying $9,000.

(g) Paro paid C.E. Doyle $4,044 of his $8,000 (plus interest) claim for concrete work whereas Tetzlaff paid Doyle $4,000.

(h) Tetzlaff decided who was to be paid by Modular.

(i) Paro maintained Modular's checkbook and knew what was being paid.

(j) Modular did not pay Doyle or Inryco because it did not have any money.

Although the above shows that Inryco and Doyle each claimed that Modular, Paro and Tetzlaff committed theft by contractor, Paro did not prove these claims or any

---

1.  WIS.STAT. § 779.02(5) THEFT BY CONTRACTORS. The proceeds of any mortgage on land paid to any prime contractor or any subcontractor for improvements upon the mortgaged premises, and all moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor and materials used for the improvements, until all the claims have been paid, and shall not be a trust fund in the hands of any other person. *The use of any such moneys by any prime contractor or subcontractor for any other purpose until all claims, except those which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or proportionally in cases of a deficiency, is theft by the prime contractor or subcontractor of moneys so misappropriated and is punishable under s. 943.-20. If the prime contractor or subcontractor is a corporation, such misappropriation also shall be deemed theft by any officers, directors or agents of the corporation responsible for the misappropriation.* (Emphasis added)

other claims of theft by contractor. The mere fact that two parties asserted that Modular failed to pay them in accordance with WIS.STAT. § 779.02(5) coupled with evidence that all or part of these claims were paid by Paro and/or Tetzlaff does not prove that Modular misapplied construction funds held in trust for suppliers and subcontractors. Furthermore, it does not establish that Tetzlaff was responsible for any such misappropriation.[2] The court, therefore, does not have to discuss whether Paro should be subrogated to the claims that he partially paid.

For the reasons stated above, the complaint in this case must be dismissed.

---

**2.** Even if Paro had proven Inryco's and Doyle's claims were nondischargeable, his recovery would have been limited to only those claims because all other similar claims against Tetzlaff held by Modular's subcontractors and suppliers were discharged on November 29, 1982. *See* 11 U.S.C. § 523(c) Bankruptcy Rule 4007(c).