**SJ PROPERTIES SUITES, BuyCo, EHF; SJ Fasteignir, EHF; and, Askar Capital, HF, Plaintiffs,**

**and**

**Seth E. Dizard, Court–Appointed Receiver of DOC Milwaukee LP, Intervenor Plaintiff,**

v.

**STJ, P.C., d/b/a Economou Partners; EP Milwaukee, LLC; Economou Partners Construction, Inc.; John W. Economou; Steve J. Economou; and, Thomas V. Economou, Defendants.**

**EP Milwaukee, LLC, Counterclaimant,**

v.

**SJ Properties Suites, BuyCo, EHF, Counterclaim Defendant.**

**SJ Properties Suites, BuyCo, EHF, Plaintiff–Counterclaim Defendant,**

**and**

**Seth E. Dizard, Court–Appointed Receiver of DOC Milwaukee LP, Intervenor Plaintiff,**

v.

**EP Milwaukee, LLC, Defendant–Counterclaimant.**

Case Nos. 09–C–0533, 09–C–0569.

United States District Court, E.D. Wisconsin.

Dec. 17, 2010.

Anthony K. Murdock, Scott R. Halloin, Joshua J. Roever, Halloin & Murdock SC, Milwaukee, WI, for Plaintiffs.

Gregory J. Cook, Greg Cook Law Offices SC, Milwaukee, WI, for Defendants.

Timothy B. Caprez, Gregory W. Lyons, Steven J. Slawinski, O'Neil Cannon Hollman Dejong & Laing SC, Milwaukee, WI, for Intervenor Plaintiff.

## DECISION AND ORDER

RUDOLPH T. RANDA, District Judge.

This Decision and Order address three motions for summary judgment that are pending in this consolidated action. The action arises from a hotel and condominium real estate development construction project located at 1150 North Water Street, in downtown Milwaukee, Wisconsin (the "Milwaukee Project" or the "Project"). There are two separate Complaints—one setting forth the damages claims (Docket No. 84) and another setting forth the declaratory judgment claims (Docket No. 157). There are also counterclaims to each Complaint.

## STANDARDS APPLICABLE TO SUMMARY JUDGMENT

In deciding the pending motions for summary judgment, the Court applies the following standards. When considering a motion for summary judgment, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party "opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham,* 30 F.3d 879, 883 (7th Cir.1994) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; also citing *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *United States v. Rode Corp.,* 996 F.2d 174, 178 (7th Cir.1993)).

"Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial—(1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law—is upon the movant. In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.,* 475 U.S. at 587, 106 S.Ct. 1348.

Rule 56(e)(1) addresses the opposing party's obligation to respond stating "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Furthermore, in determining the material and undisputed facts, the Court has disregarded those proposed findings of fact and responses that constituted legal conclusions, were argumentative or irrelevant, were not supported by the cited evidence, or were not supported by citations specific

enough to alert the Court to the source for the proposal.

## ECONOMOU DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Defendants and Counterclaimants, STJ, P.C. d/b/a Economou Partners ("STJ, P.C."); EP Milwaukee, LLC ("EP"); Economou Partners Construction, Inc. ("Economou Construction"); John W. Economou ("John Economou"); Steve J. Economou ("Steve Economou"), and Thomas V. Economou ("Thomas Economou") (collectively the "Economou Defendants") seek summary judgment dismissing the damages claims of the Plaintiffs, SJ Properties Suites, BuyCo, ehf ("BuyCo"); SJ Fasteignir, ehf ("Fasteignir"); and, Askar Capital, hf ("Askar") (collectively the "Plaintiffs"). The Economou Defendants assert that the Plaintiffs' damages claims against them must be dismissed because the Plaintiffs entered into a *Pierringer* release [1] in this action. The Plaintiffs maintain that the motion should be denied.

### Relevant Facts [2]

DOC Milwaukee, LP (the "Partnership"), is a limited partnership that is the owner of the Milwaukee Project, a partially constructed 14–story, mixed-use building at the corner of Juneau and Water Streets in downtown Milwaukee, Wisconsin. The Partnership consists of BuyCo, and Development Opportunity Corp. ("DOC") which are limited partners, and EP, which is the general partner.

On May 1, 2006, the Partnership and STJ, P.C. entered into a Standard Form of Architect Services on AIA form B141–1997. On July 1, 2006, the Partnership and Economou Partners executed a Construction Manager Agreement on standard AIA form B801/CMa. As such, Economou Partners prepared payment applications for review by STJ, P.C. and final approval by EP.

On May 27, 2009, the Plaintiffs filed this action in this District, Case Number 09–C–0533, against various persons and entities associated with the Milwaukee Project. This case previously included allegations against DOC; DOC Development Milwaukee, LLC ("Development LLC"); DOC Ft. Myers, LLC ("DOC Ft. Myers"); Brenda Yurick ("Yurick"); and Phillip E. Hugh ("Hugh") (collectively the "DOC Parties"). The action previously, and currently, contains allegations against STJ, P.C.; EP; Economou Construction; Steve Economou; John Economou; and Thomas Economou.

The principal of one of the DOC Parties admitted that funds intended for the Milwaukee Project had been loaned to DOC Ft. Myers for the separate project being developed in Fort Myers, Florida. Thereafter, the Plaintiffs entered into a settlement agreement and *Pierringer* release with all of the DOC Parties. The *Pier-*

---

**1.** *See Pierringer v. Hoger*, 21 Wis.2d 182, 124 N.W.2d 106, 111–12 (1963) (holding that a settling tortfeasor in a multi-defendant case may be released from all future liability and could not be made a party-defendant in any action brought against the non-settling tortfeasors).

**2.** The relevant facts are taken from the parties' proposed findings of fact ("PFOF") to the extent that they are undisputed. Citations to quoted excerpts have been included even when the facts are undisputed.

To the extent that a party has responded to a proposed finding of fact with the statement "deny" without citing any supporting factual material, that party has failed to raise a genuine factual dispute. *See* Fed.R.Civ.P. 56(e)(2); Civil L.R. 56(b)(2)(B)(i)(E.D.Wis.). *See also, Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir.2008) (quoting *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir.2003) (stating "mere disagreement with the movant's asserted facts is inadequate to defeat summary judgment if made without reference to specific supporting material.")). (*See e.g.,* Economou Defs.' Resps. to Pls.' PFOF 9–13.)

*ringer* release ("Release") was signed by the Plaintiffs in the fall of 2009. (*See* Ex. A to the Affidavit of Gregory J. Cook filed on February 18, 2010) ("Cook Feb. 2010 Aff."). The Release refers to the Plaintiffs collectively as the "Releasing Persons," and the DOC Parties as the "Released Persons." (Cook Feb. 2010 Aff. ¶ 3 Ex. A.)

By the Release, the DOC Parties were dismissed from the lawsuit,[3] and the Plaintiffs withdrew the claims against them under Wis. Stat. § 779.02(5); Wis. Stat. § 895.446; and Wis. Stat. § 943.20(1)(b). Section 779.02(5) of the Wisconsin Statutes provides for a theft by contractor claim.

Paragraph 4 of the Release states:

To permit the full effectiveness of the *Pierringer* provisions of this agreement for the **Released Persons,** without impairing the **Releasing Persons'** ability to pursue any non-settling parties (generally, as well as those specific entities and persons defined in this paragraph), the **Released Persons,** hereby fully reserve, preserve and maintain all actions, causes of actions, claims, demands, liabilities, rights, or suits of any kind or nature whatsoever (whether arising in contract, tort, or otherwise, and all damages, injuries or losses suffered or incurred to date, including all costs, expenses and attorney's fees suffered or incurred in connection with the Actions) against [STJ, P.C., EP, ECONOMOU CONSTRUCTION, JOHN ECONOMOU, STEVE ECONOMOU, THOMAS ECONOMOU], and any other entity that these entities or persons own or have an ownership interest (collectively being referred to as the *"Non–Settling*

*Parties ").* The **Released Persons** hereby irrevocably and unconditionally assign, grant, convey and transfer to [BUYCO] or to the Receiver as their interests may appear, all such actions, causes of actions, claims, demands, liabilities, rights, or suits of any kind or nature whatsoever (whether arising in contract, tort, or otherwise), against all non-settling parties, including the Non–Settling Parties. This assignment is separate and independent consideration for the release of the **Released Persons.** In addition, to permit the full effectiveness of the *Pierringer* provisions of this agreement for the **Released Persons,** without impairing the **Releasing Persons'** ability to pursue non-settling parties, including the **Non–Settling Parties,** the **Released Persons** specifically assign all indemnification and contribution claims that they have against the **Non–Settling Parties,** and all actions, causes of actions, claims, demands, liabilities, rights, or suits of any kind or nature whatsoever (whether arising in contract, tort, or otherwise) that they have against the **Non–Settling Parties,** to the **Releasing Persons.**

(Cook Feb. 2010 Aff. ¶ 4 Ex. A.)

The Plaintiffs' Complaint[4] revolves around two sets of alleged wrongdoings. The Plaintiffs believe that both the DOC Parties and the Plaintiffs were the victims of § 779.02(5) violations associated with draw requests and payment applications submitted by the Economou Defendants that falsely represented the percentage of completion of the Milwaukee Project work. These are not "co-intentional tortfeasor"

---

**3.** Paragraph 1 of the Economou Defendants' proposed findings of fact in support of their motion for summary judgment lists the name of the final defendant who signed the release as "Phillip Yurick," rather the "Phillip E. Hugh." The Court has corrected the error.

**4.** The Complaint setting forth damages claims is the subject of the Economou Defendants' summary judgment motion and all references to the Complaint are to the damages Complaint, Docket No. 84.

torts, but wrongful actions that were solely by the Economou Defendants.

The Plaintiffs also believe that the DOC Parties improperly loaned funds advanced for the Milwaukee Project to another project being developed by the Economou Defendants and the DOC Parties in Fort Myers, Florida. The Plaintiffs received an assignment of claims where the DOC Parties were the victims of wrongful actions by the Economou Defendants.

Section 779.02(5) of the Wisconsin Statutes provides for a theft by contractor claim. In their Second Amended Complaint ("Complaint"), the Plaintiffs allege as their first cause of action that STJ, P.C.; EP; Economou Construction; John Economou; Steve Economou; and Thomas Economou "intentionally used trust fund money advanced by Plaintiffs for purposes other than those permitted by Wisconsin Statutes section 779.02(5)." (Compl. ¶ 48.) Paragraph 48 of the Complaint also includes allegations under Wisconsin Statutes §§ 895.446 and 943.20(1)(b).

The Plaintiffs' second cause of action is for recoupment of misappropriated trust funds and the claim is interrelated and dependent upon the first cause of action because an interested party may petition for recoupment of funds if theft by contractor has occurred.

In their third cause of action for fraudulent transfer, the Plaintiffs allege John Economou and Steve Economou "acted with actual intent to hinder, delay, and defraud their creditors by fraudulently transferring assets to corporations that they controlled without adequate compensation." (Compl. ¶ 72.) Paragraph 72 of the Complaint is not the entire basis for the Plaintiffs' third cause of action.

A sworn statement produced by the Economou Defendants for January 31, 2009, lists the percentage of completion for the Project as a whole of 97.36%, and for Economou Construction of 99.93%. The Project was nowhere near the certified level of completion. In addition, neither the "balance to complete," "net previously paid," nor "retention" columns in the pay application are accurate, resulting in subcontractors being underpaid and the Economou Defendants taking Project funds to which they had no entitlement. (*See* Halloin Mar. 2010 Aff. ¶ 12.) Separate and apart from such claims are claims involving funds advanced by the Plaintiffs that were allegedly diverted from the DOC Parties and the Economou Defendants from the Project to a separate project being developed by the DOC Parties and the Economou Defendants in Fort Myers, Florida.

As of March 19, 2010, when the Plaintiffs filed their response to the Economou Defendants' summary judgment motion they did not know if there are other loans. As of that date, no depositions had been taken in the case. Discovery is ongoing with the job cost accounting for the Milwaukee Project. To date, no fact finder has determined, nor been asked to determine, whether any of the DOC Parties acted intentionally. To date, no fact finder has determined, nor been asked to determine, whether any of the Economou Defendants acted intentionally.

### Analysis

■ As a federal court sitting in diversity, the Court applies state law to substantive issues and federal law to procedural and evidentiary matters. *Bevolo v. Carter*, 447 F.3d 979, 982 (7th Cir.2006). The parties agree that Wisconsin substantive law applies to the *Pierringer* release issue. This Court must apply the law of the state as it believes the highest court of the state would apply it if the issue were presently before that tribunal. *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007).

■ *Pierringer*, 124 N.W.2d at 111–12, holds that a settling tortfeasor in a

multi-defendant case may be released from all future liability and can not be made a party defendant in any action brought against the non-settling tortfeasors. A *Pierringer* release limits the plaintiff's recovery to the unsatisfied portion of the damages; that is, the portion attributable to the non-settling tort-feasors. *Id.; see also Siler v. N. Trust Co., Inc.,* 80 F.Supp.2d 906, 908–09 (N.D.Ill.2000). Stated somewhat differently, a *Pierringer* release allows for "piecemeal settlement of multi-defendant lawsuits" ... and permits a plaintiff to "settle its case with fewer than all of the defendants without releasing its claims against the non-settling defendant." *Siler,* 80 F.Supp.2d at 908–09.

■■ Three elements must be satisfied for a valid *Pierringer* release: (1) complete release of the settling defendant by the plaintiff; (2) the plaintiff's express reservation for claims against any remaining and non-settling defendants; and (3) the plaintiff must agree to indemnify the settling defendant against claims for contribution or indemnification. *Id.* at 909; *see also Fleming v. Threshermen's Mut. Ins. Co.,* 131 Wis.2d 123, 388 N.W.2d 908, 911 (1986) (holding that *Pierringer* principles apply to action for indemnity as well as actions for contribution). "[A] *Pierringer* release operates to impute to the plaintiff whatever liability in contribution or indemnity the settling joint tort-feasor may have to the non-settling joint tort-feasor." *Brandner by Brandner v. Allstate Ins. Co.,* 181 Wis.2d 1058, 512 N.W.2d 753, 762 (1994).

■■ The premise of the Economou Defendants' summary judgment motion is that although the *Pierringer* release at-

tempts to release some but not all of the alleged intentional tortfeasors in this action, the Plaintiffs have released all of the intentional tortfeasors and, therefore, the Complaint should be dismissed. In so contending the Economou Defendants rely upon *Fleming,* 388 N.W.2d at 911, and the language of the Release. The Plaintiffs assert that the motion is premature, and legally and factually flawed.

In *Fleming,* the court was presented with the questions of whether a negligent tortfeasor has a right of indemnity or contribution from an intentional tortfeasor and how a *Pierringer* release affects the right of the negligent tortfeasor. *Id.* at 908–09. The court held that a negligent tortfeasor has a right to indemnity from an intentional joint tortfeasor. *Id.* at 909. The court further concluded that a *Pierringer* release of an intentional joint tortfeasor operates to absolve a negligent tortfeasor of liability to a plaintiff because the negligent tortfeasor's right to indemnity from the intentional joint tortfeasor becomes a right to indemnity from the plaintiff. *Id.*

The claims against the Economou Defendants are not identical to those pled against the DOC Parties. The claim that the Economou Defendants wrongfully transferred funds to themselves based on inflated claims of completed work involves conduct that may be independent of the diversion of the funds to the Fort Myers project.

■■■ In asserting that their theft by contractor claim does not require proof of intent, the Plaintiffs maintain that intent is not an element of a § 779.02(5) claim.[5] However, the Plaintiffs' first cause of action does not rely solely on § 779.02(5);[6] it

---

**5.** Section 779.02(5) of the Wisconsin Statutes "is designed to protect subcontractors and material suppliers by making money paid by the owner to the contractors and subcontractors a trust fund for the subcontractors and

material suppliers." *Kraemer Bros., Inc. v. Pulaski State Bank,* 138 Wis.2d 395, 406 N.W.2d 379, 381–82 (1987)

**6.** Section 779.02(5) of the Wisconsin Statutes provides:

also relies upon §§ 895.446 [7] and 943.20(b)(1). *Tri–Tech Corp. of America,* 646 N.W.2d at 829–30, analyzes the interplay of the three statutes invoked by the Plaintiffs' claim for theft by a contractor with a treble damages remedy. *Tri–Tech* holds that a civil theft by a contractor claim that incorporates §§ 895.446 and 943.20(b)(1) is a specific intent cause of action, and the person claiming theft by a contractor must prove intent by a preponderance of the evidence. *See id.* Intent to commit theft by contractor can be inferred, but must be proven by the plaintiff by the preponderance of the evidence. *Id.* at 829. "The intent establishing the violation is the intent to use moneys subject to a trust for purposes inconsistent with the trust." *State v. Sobkowiak,* 173 Wis.2d 327, 496 N.W.2d 620, 626 (Wis.Ct.App. 1992). "[P]roof of an 'intent to defraud' in an action for theft by contractor requires no more than the production of sufficient probative evidence to establish criminal intent." *Id.* " 'Intentionally' means that the defendant must have had a purpose to use the money for other than the payment of claims due or to become due from him for labor or materials used in the improvements before all such claims were paid." *Id.* Therefore, to prevail on their first cause of action, BuyCo must prove that the Economou Defendants acted with intent to use the monies subject to the trust for purposes inconsistent with the trust. *See id.*

However, the Complaint includes a second cause of action for "recoupment," under the fourth sentence of § 779.02(5), the Wisconsin theft by contractor statute, which states "[a]ny of such misappropriated moneys which have been received as salary, dividend, loan repayment, capital distribution or otherwise by any shareholder, member, or partner not responsible for the misappropriation shall be a civil liability of that person and may be recov-

---

The proceeds of any mortgage on land paid to any prime contractor or any subcontractor for improvements upon the mortgaged premises, and all moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor, services, materials, plans, and specifications used for the improvements, until all the claims have been paid, and shall not be a trust fund in the hands of any other person. The use of any such moneys by any prime contractor or subcontractor for any other purpose until all claims, except those which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or proportionally in cases of a deficiency, is theft by the prime contractor or subcontractor of moneys so misappropriated and is punishable under s. 943.20. If the prime contractor or subcontractor is a corporation, limited liability company, or other legal entity other than a sole proprietorship, such misappropriation also shall be deemed theft by any officers, directors, members, partners, or agents responsible for the misappropriation. Any of such misappropriated moneys which have been received as salary, dividend, loan repayment, capital distribution or otherwise by any shareholder, member, or partner not responsible for the misappropriation shall be a civil liability of that person and may be recovered and restored to the trust fund specified in this subsection by action brought by any interested party for that purpose. Except as provided in this subsection, this section does not create a civil cause of action against any person other than the prime contractor or subcontractor to whom such moneys are paid. Until all claims are paid in full, have matured by notice and filing or have expired, such proceeds and moneys shall not be subject to garnishment, execution, levy or attachment.

7. Wisconsin Statutes § 895.446 was enacted to provide a treble damages remedy to victims of certain intentional property crimes. *See Tri–Tech Corp. of Am. v. Americomp Servs.,* 254 Wis.2d 418, 646 N.W.2d 822, 828 (2002).

ered and restored to the trust fund specified in this subsection by action brought by any interested party for that purpose."

 The Plaintiffs assert that the recoupment is a remedy rather than a cause of action. They so contend without citing any case law or supporting authority. The Plaintiffs' recoupment claim arises from the Wisconsin theft by contractor statute.[8]

 The issue of whether recoupment under § 779.02(5) is a remedy or a cause of action, has not been directly addressed by the Wisconsin courts. However, Wisconsin courts have upheld claims predicated upon the trust provision of § 779.02(5). *See Capen Wholesale, Inc. v. Probst*, 180 Wis.2d 354, 509 N.W.2d 120, 121 (Wis.Ct. App.1993); *W.H. Major & Sons, Inc. v. Krueger*, 124 Wis.2d 284, 369 N.W.2d 400, 403–04 (Wis.Ct.App.1985). The statute expressly states that when an owner pays money to a prime or subcontractor for improvements, the *money constitutes a* trust fund in the hands of that prime or subcontractor. *See In re Ward*, 417 B.R. 582, 587 (Bankr.E.D.Wis.2009). The beneficiaries of such trusts are the "laborers, suppliers and materialmen," as well as "owners and contractors." *Id.* (citing *Matter of Thomas*, 729 F.2d 502, 506 (7th Cir.1984)). In order to establish that a trust exists in this case, the Plaintiffs must establish that (1) an owner (2) paid monies (3) to EP (4) for improvements (5) and that EP used the monies in trust for purposes other than paying the claims of subcon-

tractors for labor or materials used for improvements. *See Capen Wholesale, Inc.*, 509 N.W.2d at 123–24; *In re Ward*, 417 B.R. at 587; *Matter of Tetzlaff*, 44 B.R. 177, 179 (Bankr.E.D.Wis.1984) (holding that in order for the plaintiff to sustain his claim, he was required to present evidence that the debtor-defendant received payments from its customers in trust for its suppliers and that the debtor-defendant, as an officer and director of the business, misapplied those funds contrary to Wis. Stat. § 779.02(5)). Moreover, the Wisconsin courts have held that a civil claim for theft by contractor does not require proof of intent. *See State v. Hess*, 99 Wis.2d 22, 298 N.W.2d 111, 114 (Wis.Ct. App.1980). Thus, this Court concludes that a statutory recoupment "cause of action" under the fourth sentence of Wis. Stat. § 779.02(5) may be a "claim," and does not require proof of intent.

 The third cause of action in the Plaintiffs' Complaint is under the Uniform Fraudulent Transfers Act ("UFTA"). Under the UFTA, a transfer of funds is fraudulent as to present and future creditors if:

> The debtor made the transfer or incurred the obligation as follows:
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

---

8. Under federal common law, the doctrine of equitable recoupment is available to both the taxpayer and the government, depending on the circumstances, where inequitable consequences have resulted from application of the statute of limitations. *See, e.g., Stone v. White*, 301 U.S. 532, 539, 57 S.Ct. 851, 81 L.Ed. 1265 (1937); *Bull v. United States*, 295 U.S. 247, 262, 55 S.Ct. 695, 79 L.Ed. 1421 (1935). As a general matter, a defendant's right to plead "recoupment," a "defense arising out of

some feature of the transaction upon which the plaintiff's action is grounded," *Rothensies v. Electric Storage Battery Co.*, 329 U.S. 296, 299, 67 S.Ct. 271, 91 L.Ed. 296 (1946) (quoting *Bull*, 295 U.S. at 262, 55 S.Ct. 695), "survives the expiration of the period provided by a statute of limitation that would otherwise bar the recoupment claim as an independent cause of action." *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 415, 118 S.Ct. 1408, 140 L.Ed.2d 566 (1998).

(1) Was engaged or was about to engage in a business transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(2) Intended to incur, or believed or reasonably should have believed that he or she would incur debts beyond his or her ability to pay as they become due.

Wis. Stat. § 242.04(1). Section 242.04(1)(a) expressly requires intent, and § 242.04(2) lists factors to consider in determining the existence of "actual intent" under § 242.04(1)(a).[9] Similarly, under the UFTA a transfer is fraudulent as to present creditors "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent by reason of the transfer." Wis. Stat. § 242.05(1). Intent is not required under § 242.05. *See DeWitt, Porter, Huggett Schumacher & Morgan, S.C. v. Kovalic,* 991 F.2d 1243, 1246 (7th Cir.1993) ("A plaintiff-creditor does not have to prove that the debtor intended to defraud her in a fraudulent conveyance action under § 242.05."). Under Wisconsin law, "the party alleging fraud has the burden of proving it by clear and convincing evidence." *Williams v.*

*Rank & Son Buick, Inc.,* 44 Wis.2d 239, 170 N.W.2d 807, 809 (1969). *See also Matter of Loyal Cheese Co., Inc.,* 969 F.2d 515, 518 (7th Cir.1992) (regarding UFTA); *Mann v. Hanil Bank,* 920 F.Supp. 944, 950 (E.D.Wis.1996) (same).

The Plaintiffs' Complaint simply cites the UFTA; it does not specify the statute or subsection under which the statutory claim is being advanced. The third cause of action alleges acts that could be deemed a violation of § 242.04 in that it states John Economou and Steve Economou transferred $310,189.00 out of the Partnership to shield those funds from creditors and they transferred funds to the Fort Myers Project without compensation and that they acted with actual intent to hinder, delay, and defraud their creditors by transferring assets that they controlled without adequate compensation. (Compl. ¶¶ 69–72.)

However, the Complaint also alleges that John and Steve Economou were insolvent because the amount they personally owed creditors exceeded their ability to pay. (Compl. ¶ 73.) Such allegation taken together with the allegation that they transferred the funds to the Fort Myers Project without adequate compensation could give rise to a claim under § 242.05(1).

9. Section 242.04(2) of the Wisconsin Statutes states:

In determining actual intent under sub. (1)(a), consideration may be given, among other factors, to whether:

(a) The transfer or obligation was to an insider;

(b) The debtor retained possession or control of the property transferred after the transfer;

(c) The transfer or the obligation was disclosed or concealed;

(d) Before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

(e) The transfer was of substantially all the debtor's assets;

(f) The debtor absconded;

(g) The debtor removed or concealed assets;

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Thus, the third cause of action for fraudulent transfer alleges claims arising under § 242.04(1) which requires proof of intent, and § 242.05(1) which does not require proof of intent. Consequently, the Plaintiffs' claims would not be subject to dismissal because the third cause of action against them includes an alleged violation that does not require proof of intent.

The claim for recoupment and a possible claim under UFTA (the third cause of action) do not require proof of intent. Therefore, the Economou Defendants' motion for summary judgment dismissing the Plaintiffs' claims against them based on the *Pierringer* release between the Plaintiffs and the DOC Parties is denied.

## BUYCO'S MOTION FOR SUMMARY JUDGMENT DISMISSING THE ECONOMOU DEFENDANTS' COUNTERCLAIMS

BuyCo seeks summary judgment dismissing Economou Defendants' counterclaims with respect to the damages Complaint. EP asserts that BuyCo has not established that EP's counterclaims are subject to dismissal upon summary judgment.[10]

### Withdrawal of Counterclaims by Five Economou Defendants

In response to the summary judgment motion, five of the six Economou Defendants—namely, STJ, P.C.; Economou Construction; John Economou; Steve Economou, and Thomas Economou—state that they withdraw their counterclaims. (*See* Economou Defs.' Resp. Br. Opp'n Mot. Summ. J. 1–2.) However, BuyCo filed an answer to the counterclaims and a motion for summary judgment. And, the parties have not filed a written stipulation signed by them dismissing the counterclaims of STJ, P.C.; Economou Construction; John Economou; Steve Economou, and Thomas Economou. Consequently, an order of this Court is required. *See* Fed. R.Civ.P. 41(a).

In its reply brief, BuyCo notes and does not object to the dismissal of the counterclaims of STJ, P.C.; Economou Construction; John Economou; Steve Economou, and Thomas Economou. In light of the foregoing, the damages counterclaims of STJ, P.C.; Economou Construction; John Economou; Steve Economou; and Thomas Economou are dismissed.

The Court will now address BuyCo's summary judgment motion, which consistent with the Second Amended Complaint and BuyCo's amended proposed findings of fact, no longer requests that the Court declare who is the general partner of the Partnership. (*See* BuyCo's Mot. Amend Am. Compl. for Declaratory Relief & Amend BuyCo's Proposed Findings of Fact 3.) The Court begins by setting forth the relevant facts.

### Relevant Facts

On November 9, 2006, the Partners of DOC Milwaukee, LP (the "Partnership") executed a Limited Partnership Agreement (the "Agreement"). A copy of the Agreement attached as exhibit A to the February 2010 Halloin affidavit in support of summary judgment. ("Halloin Feb. 2010 Aff.") The Agreement requires the application of Delaware law.

At the Partnership's inception, BuyCo and EP were both limited partners and DOC Milwaukee II, LLC ("DOC II") was the general partner. DOC II's members are Hugh and Yurick. DOC succeeded DOC II as the general partner. The

---

10. The Court will apply the standards for summary judgment that it previously set forth. The statement of relevant facts is based upon the parties' proposed findings of fact to the extent they are undisputed. Citations to all quoted excerpts are provided regardless of whether they are undisputed.

Agreement set forth each Partner's percentage interest in the Partnership. The original contributions were established on exhibit A to the Agreement. BuyCo was the sole partner advancing cash and its capital contribution was to be $7 million.

Article V of the Agreement is the only portion of the Agreement that addresses future contributions. Article V governs capital accounts and clearly states that no partner can be required to advance additional capital, but if one partner does and others do not, the ownership percentages must be adjusted. However, it was also specifically contemplated as a possibility in Article 5.2 that DOC II or EP could contribute capital.

Exhibit C to the Halloin February 2010 affidavit is a copy of the first page and guaranty page of the January 9, 2008, loan agreement between the Partnership and Specialty Finance Group, LLC. ("SFG"). The personal guarantors of the loan are Hugh, John Economou, and Steve Economou. BuyCo did not sign the guaranty.

Due to numerous changes and upgrades to the plans and designs for the hotel and condominiums, along with work stoppages caused by BuyCo's failure to timely fund construction draws, the Project went over budget which was a violation of the terms of the loan with the senior lender, SFG. Due to this gap in financing, SFG forced the Partnership to enter into a forbearance agreement on about October 8, 2008, with respect to the loan agreement between the Partnership and SFG. The forbearance agreement, attached as exhibit B to the Halloin February 2010 affidavit, was entered into with the knowledge and consent of all the partners of the Partnership. The forbearance agreement required the Partnership to make an equity contribution of $4,000,000 on or before December 1, 2008, to fund improvements to the development of the Milwaukee Project. The forbearance agreement was jointly and severally guaranteed by Hugh, John Economou, and Steve Economou.

Attached as exhibit A to the affidavit of John Economou that was filed on March 28, 2010, ("Economou Mar. 2010 Aff.") are copies of email correspondence between John Economou and other parties from October 6, 2008, to October 9, 2008, regarding the forbearance agreement. On October 7, 2008, Johann Fridrik Haraldsson ("Haraldsson") sent multiple individuals, including John Economou, an email regarding the forbearance agreement stating, "Under paragraph 6.B. in the agreement it says that we have to put in additional 4 million in equity. I am assuming those 4 are part of the 7, 5 million mezz piece. For what are the remaining, 3, 5?" Pór4ur Gíslason—whose name in English is Thordur Gislason ("Gislason")—was copied on the email. (Economou Mar. 2010 Aff. ¶ 14, Economou Ex. A.)

During fall of 2008, Gislason and Haraldsson represented Askar, the financial advisor to BuyCo, and Gislason and Haraldsson "negotiated structures, approved and funded deals on behalf of Askar." (Economou Defs.' Add'l Facts ¶ 13; BuyCo's Resp. to Defs.' Statement of Proposed Material Facts ¶ 13.) From October 6, 2008, through October 9, 2008, Haraldsson forwarded funds on behalf of BuyCo and based on that activity John Economou believed that Haraldsson represented BuyCo. After Gislason left Askar in late 2008, Haraldsson represented Askar, until he turned over its representation to Bjarki A. Brynjarsson ("Brynjarsson").

There was never a formal capital call made pursuant to Section 5.2 of the Agreement requesting that any of the partners contribute additional capital. There also was neither a Partnership meeting to discuss making a capital call nor a motion made by a partner to make a capital call for the additional funds. None of the

mechanisms required by Section 5.2(a) or (b) were utilized to obtain the $4 million or the financing under the second forbearance agreement.[11]

During late November and early December of 2008, DOC II, the general partner, and all limited partners of the Partnership were well aware of the status of the financing and construction and DOC II indicated that it wanted to step down as the general partner. All the partners discussed the replacement of the general partner and all the partners chose EP to replace DOC II, as general partner on December 16, 2008. A Unanimous Consent of the partners of the Partnership naming EP as the new general partner, was executed on December 16, 2008.

On December 16, 2008, EP succeeded DOC II as the Partnership's general partner. EP owners are John Economou, Steve Economou, and Thomas Economou. EP replaced DOC II as the general partner until June 22, 2009, when the receivership was filed and Seth Dizard ("Dizard")

assumed the general partner functions as receiver under Wisconsin Statutes section 128.18.

BuyCo was in closed door negotiations with Wave Development, LLC ("Wave") and SFG before the Plaintiffs filed case number 09–C–569 on June 8, 2009, and case number 09–C–533 on May 27, 2009. EP was present during some but not all of the meetings. EP was excluded from all meetings after BuyCo filed its theft by contractor action on May 27, 2009. BuyCo refused to include EP in the discussions with Wave and SFG and BuyCo refused to provide information regarding the discussions.

Attached as exhibit D to the Halloin February 2010 affidavit are copies of a letter sent by the receiver's counsel to Wave on July 24, 2009, and a letter sent by EP[12] to Wave on July 22, 2009. Exhibit E to the Halloin February 2010 affidavit are copies of attachments to the August 14, 2009, affidavit of John Wieser ("Wieser"),

---

**11.** Sections 5.2(a) and (b) of the Agreement, entitled Additional Capital Contributions, state:

(a) The Partners recognize that, in addition to the Capital Contributions, the Partnership may request additional capital from time to time. The Partners shall be requested to contribute additional capital to the Partnership upon the Partners' determination by a vote of the Required Interest that such additional capital is necessary for the Partnership. No Partner shall be required to make any additional contribution to capital. All Partners shall have the right to contribute such additional capital based on their then existing pro rata ownership interest in the Partnership.

(b) If any Partner fails to pay all or any portion of any additional capital contribution requested pursuant to Section 5.2(a) within ten (10) days after written notice of demand, the other Partners shall have the right (i) to make such additional contribution to capital (and as between them in accordance with the respective pro rata In-

terests of the Partners that desire to make such contribution) and (ii) as set forth in the foregoing notice of demand, to pro rata increase the respective Percentage Interests of the contributing Partners and to reduce the respective Percentage Interests of the Partners that do not make such contributions. In the event any Partner fails to pay all or any portion of additional capital requested as set forth herein, such Partner shall lose its power to vote on any and all matters.

(Halloin Feb. 2010 Aff. ¶ 2, Ex. A.)

**12.** Paragraph 17 of BuyCo's proposed material facts, which is undisputed, states that the letter was sent by the "Economou Partners." However, Exhibit D, cited in the factual statement, is signed by John Economou for EP and the letter demands on behalf of EP, as general partner for the partnership, and the receiver that Wave not negotiate with BuyCo "unless and until" EP and the receiver are included in the negotiations. Given the foregoing, the Court has revised the statement to reflect that EP sent the letter.

filed in case number 09–C–533. Askar served as financial advisor for BuyCo.

A copy of portions of the April 3, 2009, second forbearance agreement, signed by EP as the general partner of the Partnership is attached as exhibit M to John Economou's March 2010, affidavit. The second forbearance agreement was executed with the understanding that BuyCo promised to fund the contributions required under the forbearance agreement.[13] John Economou was forwarded or sent copies of emails from April 1, 2009, regarding the second forbearance agreement. (Economou Mar. 2010 Aff., Ex. B.)[14]

On April 1, 2009, Haraldsson sent SFG an email regarding Askar's payment pursuant to the forbearance agreement.[15] On April 1, 2009, Haraldsson represented Askar, the financial advisor for BuyCo, and based on such representation Haraldsson represented BuyCo.

On April 29, 2009, BuyCo attempted to exercise its right under Section 8.2 of the Agreement to terminate EP as the Partnership's general partner,[16] and requested the right to inspect the Partnership's financial records because of the uncured defaults with respect to the Project's completion by EP. On April 30, 2009, BuyCo again attempted to assert its rights as the general partner and again requested the ability to review the financial documents of the Partnership. On April 30, 2009, BuyCo noticed a special meeting of the Partnership for Wednesday, May 13, 2009. A Partnership meeting was held on May 13, 2009, to resolve the issue of who was general partner. BuyCo and its counsel attended the meeting, as did EP, through its counsel, Wieser. DOC II did not participate in the meeting. No action was taken at the meeting. EP continued to maintain that it was general partner.

Section 8.1 describes the powers and duties of the general partner. It states, in part: "the business and the affairs of the Partnership shall be conducted and managed solely under the direction of the general partner including entering into, making and performing contracts, agreements, and undertakings binding the Partnership that may be necessary, appropriate, or advisable in furtherance of the Project." (Halloin Feb. 2010 Aff. ¶ 2, Ex. A) Section 8.1 goes on to list, without limitation, eight types of actions that the general partner may take on behalf of the Partnership.

On March 31, 2009, Wieser sent an email to Lee van Egmond ("Egmond"), legal

---

13. BuyCo asserts that there is a factual dispute regarding whether the forbearance agreement would have been executed absent the understanding that BuyCo would fund the contributions required under the forbearance agreement. However, it also states that the dispute is not material to the issues involved in the summary judgment motion regarding EP's counterclaims.

14. Paragraph 20 of the Economou Defendants' additional facts refers to the second forbearance agreement. However, BuyCo's Response to paragraph 20 of those proposed facts states the emails relate to the third forbearance agreement. However, they do not cite any evidentiary material in support of that contention. Moreover, the subject line on the emails state "DOC Milwaukee 2nd Forbearance Agreement," (Economou Mar.

2010 Aff. ¶ 20, Ex. B), and the second forbearance agreement was executed April 3, 2009. BuyCo has not raised a factual dispute.

15. [Missing Text]

16. Section 8.2(a) of the Agreement states:

[DOC II], which is managed by [Hugh], shall serve as General Partner during the entire term of the Partnership. Upon death or disability of [Hugh], the Partners (by vote of the Required Interest) shall designate a successor. In the event of an uncured event of default under the development for the Project (to be entered into pursuant to Section 8.6 hereof), BuyCo shall have the right to appoint a new General Partner for the Partnership.

(Halloin Feb. 2010 Aff. ¶ 2, Ex. A.)

counsel for BuyCo, and copied John Economou on the email. (*See* Economou Mar. 2010 Aff., Ex. D.) On March 30, 2009, John Economou sent an email to Egmond. (Economou Mar. 2010 Aff. ¶ 40, Ex. E.) Wieser sent an email to Egmond on April 1, 2009, with a copy also being sent to John Economou. (Economou Mar. 2010 Aff., Ex. F.)

EP presented an option [17] from Taylor Town Investment Partners, LLC ("Taylor Town"), an Ohio limited partnership company that is a lender.

On May 14, 2009, Haraldsson represented Askar, the financial advisor for BuyCo. On May 14, 2009, EP Milwaukee sent BuyCo a summary of a potential proposal from Taylor Town, but did not provide the actual proposal.

On May 27, 2009, this lawsuit, alleging theft by contractor, was filed. On May 29, 2009, John Economou sent an email to Haraldsson regarding a buy out discussion. (*See* Economou Mar. 2010 Aff. ¶ 52, Ex. H.) On May 29, 2009, Haraldsson represented Askar, the financial advisor for BuyCo.

On June 8, 2009, BuyCo, through its counsel, disputed EP's notice of meeting for June 5, 2009, contending that EP lacked the ability to call a meeting and its notice was facially invalid. Later on June 8, 2009, BuyCo filed a separate lawsuit seeking a declaration of rights over who was acting as general partner for the Partnership contending that EP refused to turn over the records of the partnership and the Project's accounting records, and to recognize BuyCo's status as owning over a 67% required interest.

On June 9, 2009, John Economou sent emails regarding the updated Taylor Town financing schedule to Haraldsson, who represented Askar, the financial advisor for BuyCo. (*See* Economou Mar. 2010 Aff. ¶ 54, Ex. I.) On June 9, 2009, John Economou sent emails to Brynjarsson regarding Taylor Town. (*See* Economou Mar. 2010 Aff. ¶¶ 54 & 58, Ex. J & Ex. K.) On June 9, 2009, Wieser sent a letter to Halloin, and copied John Economou on the letter. (*See* Economou Mar. 2010 Aff. ¶ 60, Ex. I.)

BuyCo's main contact, authorized agent, was Askar.[18] The only way to get to BuyCo was through Askar.

On June 22, 2009, a receivership action was filed in Milwaukee County Circuit Court, *In re DOC Milwaukee, L.P.*, as Case No. 09–C–9785 ("Receivership Action"). One of the reasons cited in the Petition for the Receivership Action was the existence of a dispute over who was entitled to serve as general partner and that there was a disagreement among the parties that had effectively deadlocked the Partnership. On June 30, 2009, an interim order appointing Dizard as the receiver on a temporary basis was entered in the Receivership Action. *See* http://wcca. wicourts.gov/courts (last visited Nov. 30, 2010.) [19]

---

**17.** There is a factual dispute regarding the nature of the financial option and its viability.

**18.** Paragraph 58 of the Economou Defendants' proposed additional facts, which is taken directly from paragraph 61 of John Economou's March 2010 affidavit states "BuyCo's main contact, authorized agent was Askar, the only way to get to BuyCo was through Askar." BuyCo responded to the proposed additional fact admitting that Askar was the advisor to BuyCo and one avenue to contact BuyCo, and that, because of language differences, it was potentially the most convenient method for EP in Milwaukee to contact BuyCo. However, BuyCo also asserts, without citation to any evidentiary material, that Askar was certainly not the only way to get to BuyCo. BuyCo has not raised a factual dispute. It also makes the conclusory statement that agency principles are different in Iceland.

**19.** Paragraph one of BuyCo's proposed additional facts states that on June 30, 2009, the

On July 2, 2009, EP provided BuyCo with a copy of the Taylor Town proposal for the first time. On July 8, 2009, an order appointing Dizard as the receiver in the Receivership Action was entered, with EP's consent.

Prior to the appointment of the receiver on July 8, 2009, John Economou went to 15 different lenders to try to find a bridge lender to loan the $4 million that BuyCo promised [20] to do through the forbearance agreement but then did not.[21] On July 27, 2009, BuyCo responded to the Taylor Town proposal by presenting a counter-proposal.

On December 17, 2009, the Economou Defendants asserted three counterclaims: (1) a violation of Section 17–502 of the Delaware Revised Limited Partnership Act ("DRLPA") claim; (2) breach of the duty of good faith and fair dealing claim; and (3) a breach of fiduciary duty claim. STJ, P.C.; Economou Construction; John Economou; Steve Economou; and Thomas Economou are not partners of the Partnership. Of the parties to this case, only BuyCo and EP are partners of the Partnership.

### Applicable Law

The counterclaims are based upon alleged violations of the Delaware law and the Agreement. This is a diversity case, and because the Agreement contains a Delaware choice-of-law provision, the Court applies Delaware law to the claims arising out of the breach of the Agreement. *Fix v. Quantum Indus. Partners LDC,* 374 F.3d 549, 551 (7th Cir.2004); *see also, Harper v. Del. Valley Broad., Inc.,* 743 F.Supp. 1076, 1083 (D.Del.1990).

Delaware Code Title 6, section 17–502 reads:

(a)(1) Except as provided in the partnership agreement, a partner is obligated to the limited partnership to perform any promise to contribute cash or property or to perform services, even if that partner is unable to perform because of death, disability or any other reason. If a partner does not make the required contribution of property or services, he or she is obligated at the option of the limited partnership to contribute cash equal to that portion of the agreed value (as stated in the records of the limited partnership) of the contribution that has not been made.

(2) The foregoing option shall be in addition to, and not in lieu of, any other rights, including the right to specific performance, that the limited partnership may have against such partner under the partnership agreement or applicable law.

(b)(1) Unless otherwise provided in the partnership agreement, the obligation of a partner to make a contribution or return money or other property paid or distributed in violation of this chapter

---

order appointing the receiver was entered, citing the Wisconsin Circuit Court Access for Milwaukee County Circuit Court Case No. 09–CV–09785. However, that court record indicates that it was an interim order.

**20.** BuyCo responded to Paragraph 63 of the Economou Defendants' proposed additional facts regarding the July 8, 2009, date of the order appointing the receiver denying the fact and citing docket number 22, exhibit 1. However, those papers, the affidavit of Gregory W. Lyons filed on August 5, 2009, and exhibit 1,

thereto, which is a copy of the July 8, 2009, state court order appointing the receiver do not create a factual dispute.

**21.** In response to paragraph 58 of the Economou Defendants' proposed additional facts, BuyCo asserts that "the date for the **appointment** of the receiver is inaccurate," and refers to the June 22, 2009, date that the receivership proceeding was **filed** in the Circuit Court for Milwaukee County, Wisconsin. (Emphasis added.) BuyCo has conflated the two events which occurred on two different dates.

may be compromised only by consent of all the partners.

2) A conditional obligation of a partner to make a contribution or return money or other property to a limited partnership may not be enforced unless the conditions to the obligation have been satisfied or waived as to or by such partner. Conditional obligations include contributions payable upon a discretionary call of a limited partnership or a general partner prior to the time the call occurs.

(c) A partnership agreement may provide that the interest of any partner who fails to make any contribution that he or she is obligated to make shall be subject to specified penalties for, or specified consequences of, such failure. Such penalty or consequence may take the form of reducing or eliminating the defaulting partner's proportionate interest in the limited partnership, subordinating the partnership interest to that of nondefaulting partners, a forced sale of his or her partnership interest, forfeiture of that partnership interest, the lending by other partners of the amount necessary to meet his or her commitment, a fixing of the value of that partnership interest by appraisal or by formula and redemption or sale of the partnership interest at such value, or other penalty or consequence.

(Del.Code Ann. tit. 6, § 17–502).

Delaware Code Title 6, section 15–404 reads:

(a) The only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care set forth in subsections (b) and (c).

(b) A partner's duty of loyalty to the partnership and the other partners is limited to the following:

1. to account to the partnership and hold as trustee for it any property, prof-it or benefit derived by the partner in the conduct or winding up of the partnership business or affairs or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity;

2. to refrain from dealing with the partnership in the conduct or winding up of the partnership business or affairs as or on behalf of a party having an interest adverse to the partnership; and

3. to refrain from competing with the partnership in the conduct of the partnership business or affairs before the dissolution of the partnership.

(c) A partner's duty of care to the partnership and the other partners in the conduct and winding up of the partnership business or affairs is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law.

(d) A partner does not violate a duty or obligation under this chapter or under the partnership agreement solely because the partner's conduct furthers the partner's own interest.

(Del.Code Ann. tit. 6, § 15–404).

The Delaware Revised Uniform Limited Partnership Act ("DRULPA") "embodies the policy of freedom of contract and maximum flexibility." *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 170 (Del.2002). Thus, "by statute, the parties to a Delaware limited partnership have the power and discretion to form and operate a limited partnership in an environment of private ordering according to the provisions in the limited partnership agreement." *Id.* The operative document is the limited partnership agreement and the statute merely provides the "fall-back" or default provisions where the partnership agreement is silent. *Cantor Fitzgerald, L.P. v.*

*Cantor,* No. Civ. A. 18101, 2001 WL 1456494, at \*5 (Del.Ch. Nov. 5, 2001). Only "if the partners have not expressly made provisions in their partnership agreement or [ ] the agreement is inconsistent with mandatory statutory provisions, . . . will [a court] look for guidance from the statutory default rules, traditional notions of fiduciary duties, or other extrinsic evidence." *Gotham Partners, L.P.,* 817 A.2d at 170.

The general policy of DRULPA "is that the liability of limited partners of a Delaware limited partnership is limited." Martin I. Lubaroff & Paul M. Altman, *Delaware Limited Partnerships* § 5.4 at 5–11 (2004). Nevertheless, "[t]o the extent a partnership agreement requires a partner to make a contribution, the partner is obligated, except to the extent such obligation is modified by the terms of the partnership agreement, to make such contribution to a limited partnership." *Id.* at § 6.3, 6–3. *See also* 6 Del.Code Ann. § 17–502.

### Analysis

BuyCo seeks summary judgment dismissing each of EP's counterclaims. The three counterclaims will be addressed in sequence.

#### Section 17–502 Counterclaim

With respect to EP's § 17–502 counterclaim based on BuyCo's failure to make a supplemental $4 million equity contribution by December 1, 2008, BuyCo maintains that only the Partnership may bring an action under that provision of the Delaware Code. Moreover, BuyCo states that although EP has at times acted as general partner, the counterclaims are not asserted in that capacity nor could they because those functions have been assumed by the receiver. However, in the event that the Court concludes that EP may bring the action, BuyCo contends that the provisions of § 17–502 regarding partnership obligations to contribute cash have been modified by § 5.2 of the Agreement which provides that no partner shall be required to make capital contributions. BuyCo also contends that the forbearance agreement contains no promises from BuyCo and does not bind BuyCo. BuyCo also maintains that even if EP had a claim, the statutory remedy is reallocation of partnership interests based upon the amounts funded by EP as a result of BuyCo's alleged breach; however, EP never funded any cash.

Citing § 8.2 of the Agreement, EP asserts that as the general partner of the Partnership it has standing to bring the counterclaim. It also contends that there are genuine issues of material fact regarding whether BuyCo promised to contribute cash for the forbearance agreement. Additionally, it asserts that nothing in the counterclaim lies under the jurisdiction of the receivership and the order appointing the receiver does not give the receiver the right to bring the counterclaim. Furthermore, EP contends that because there was no capital call, § 17–502(a)(2) of the DRULPA applies and gives EP the right to request specific performance and other remedies.

At the time the counterclaim was filed, EP was the purported general partner and, therefore, had standing to bring the counterclaim. To the extent, that Dizard as the receiver, is now the general partner, he has standing to bring the claim and may be the more proper proponent of the claim. Although BuyCo was not party to the forbearance agreement, there is some evidence that it promised to advance the $4 million dollars required for that transaction. While the nature of that promise is unclear at this juncture of the proceedings BuyCo has not established that, as a matter of law, it is entitled to judgment dismissing the claim. Finally, BuyCo's contention as to the limited remedies available, is contrary to § 502(c) which provides for a variety of remedies.

### Breach of Good Faith and Fair Dealing Counterclaim

■ BuyCo maintains that EP's counterclaim for breach of the duty of good faith and fair dealing should be dismissed. It states that the question for the Court is whether BuyCo owes the type of duty that is alleged to have been breached to the Partnership, which is in receivership.

EP contends that its breach of the duty of good faith and fair dealing counterclaim is based on BuyCo's actions prior to the appointment of the receiver. It further states that BuyCo violated its duties under Del.Code Tit. 6, § 15–404 when it engaged in closed door discussions with Wave and SFG and did not include EP in those discussions. EP's contention blends the concept of the implied duty of good faith and fair dealing with the fiduciary duties of § 15–404.

Delaware courts employ the implied covenant of faith and fair dealing sparingly when parties have crafted detailed complex agreements. *Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC,* C.A. No. 3658–VCS, 2009 WL 1124451 at *7 (Del.Ch. Apr. 20, 2009). However, they have recognized the occasional necessity of implying contract terms to ensure that parties' reasonable expectations are fulfilled. As noted in *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* 624 A.2d 1199, 1206 (Del.1993), "the General Partner is obliged to exercise that discretion [to exclude a limited partner from an investment opportunity] in a *reasonable* manner."

In this case, section 8.1 provides that "the business and the affairs of the Partnership shall be conducted and managed solely under the direction of the general partner including entering into, making and performing contracts, agreements, and undertakings binding the Partnership that may be necessary, appropriate, or advisable in furtherance of the Project." EP has presented evidence that BuyCo engaged in negotiations with Wave regarding the Project, without the direction of EP, the general partner. BuyCo simply asserts, without any reference to supporting case law or analysis that the type of activity alleged cannot state a cause of action. BuyCo also relies upon § 15–404 as limiting its obligation only as to engaging in those activities that would be "dealing with the partnership," and in so doing, pursing interests adverse to the partnership. BuyCo's reading of § 15–404 would nullify the Agreement's proviso that only the general partner may conduct the affairs of the Partnership. Such a reading would be contrary to Delaware's policy of regarding freedom to contract and, therefore, is not persuasive. Consequently, BuyCo has not established that EP's counterclaim for breach of good faith and fair dealing should be dismissed at this stage of the proceedings.

### Breach of Fiduciary Duty Counterclaim

■ BuyCo maintains that EP's breach of fiduciary duty counterclaim should be dismissed, because even assuming as true EP's claim that BuyCo failed to respond to a proposal, under § 15–404 there would be no violation of BuyCo's statutory fiduciary duties.

EP maintains that its breach of fiduciary duty claim should not be dismissed because there exists a genuine issue of material fact and the breach occurred before the receiver was appointed on July 8, 2009. EP relies upon the emails that it sent to Haraldsson on May 14, May 29, and June 9, 2009, regarding the Taylor Town proposal. It also relies upon the email that it forward to Brynjarsson on June 9, 2009 as well as an email that EP sent to him on that date. Additionally, EP relies upon the June 9, 2009, email from van Egmond, counsel for BuyCo, stating "[a]t this point, [BuyCo] is not willing to consider any funds from you or Taylor Town without

committed funds." (Economou Mar. 2010 Aff. ¶ 56, Ex. J.) EP maintains that such response was a refusal to participate, and that BuyCo's actions blocked the necessary quorum to vote and its actions were adverse to the Partnership. EP also maintains that BuyCo may not rely upon its July 27, 2009, counterproposal to avoid the counterclaim that, prior to the appointment of the receiver, BuyCo refused to participate in discussions with Taylor Town.

 BuyCo contends that a breach of fiduciary counterclaim is covered by Title 6– § 15–404 of the Delaware Code. Absent a contrary provision in the partnership agreement, the general partner of a Delaware limited partnership owes the traditional fiduciary duties of loyalty and care to the Partnership and its partners. *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, No. Civ. A. 15754, 2000 WL 1476663, *10 (Del.Ch. Sept. 27, 2000). However, under Delaware limited partnership law, a claim of breach of fiduciary duty must first be analyzed under the terms of the partnership agreement—and only when that agreement is silent or ambiguous, will a court begin to look for guidance from the statutory default rules, traditional notions of fiduciary duties, or other extrinsic evidence. *See Sonet v. Timber Co.*, 722 A.2d 319, 324 (Del.Ch. 1998). In this instance, neither party points to any provision of the Agreement addressing fiduciary duties.

Both EP and BuyCo claim to have been the general partner after April 29, 2009.

If BuyCo was the general partner, then it may be liable for a breach of fiduciary duty. Furthermore, although BuyCo contends that the claim is frivolous and the Taylor Town option was not viable, there are genuine disputes of material fact regarding the option and its viability. Therefore, EP's counterclaim is not subject to dismissal at this stage of the proceedings.

### BuyCo's Summary Judgment Motion– Declaratory Judgment

BuyCo, the plaintiff in the declaratory judgment action, Case No. 09–C–569 (the "569 action"), filed its motion for summary judgment on the declaratory judgment claims prior to the consolidation of the actions. On August 18, 2010, the Court granted BuyCo's motion to file an amended statement of proposed findings of fact. EP was afforded an opportunity to file a revised summary judgment submission or a statement that it did not intend to file any such response. EP did not. BuyCo subsequently filed a statement indicating that it will not file a reply brief.

BuyCo seeks summary judgment in its favor on its declaratory judgment claims that its interest in the Partnership exceeds 67%, and that EP and DOC have lost their voting rights. (*See* Pl.'s Mot. Amend Am. Compl. for Declaratory Relief and to Amend Pl.'s PFOF 4; Pl.'s Br. Support Mot. Summ. J. 12)

#### *Relevant Facts* [22]

BuyCo is a limited partner of the Partnership. BuyCo is an Icelandic private

---

**22.** The relevant facts are taken from the parties' proposed findings of fact to the extent that they are undisputed. Citations to quoted excerpts have been included even when the facts are undisputed.

To the extent that a party has responded to a proposed finding of fact with the statement "deny" without citing any supporting factual material, that party has failed to raise a genuine factual dispute. *See* Fed.R.Civ.P. 56(e)(2); Civil L.R. 56(b)(2)(B)(i)(E.D.Wis.). *See also, Montano*, 535 F.3d at 569 (quoting *Smith*, 321 F.3d at 683) ("[M]ere disagreement with the movant's asserted facts is inadequate [to defeat summary judgment] if made without reference to specific supporting material.")

EP has presented additional proposed findings of fact, many of which are not accompa-

limited company, designated by abbreviation as "ehf." Former Defendant DOC II is a Delaware limited liability company that acted as the first general partner of the Partnership. Former Defendant DOC, was one of the original limited partners of the Partnership.

EP is an Illinois limited liability company whose members are John Economou, Steve Economou, and Thomas Economou. EP was a limited partner of the Partnership and succeeded DOC II, as the Partnership's general partner.

The Court has jurisdiction over this matter under 28 U.S.C. § 1332, diversity of citizenship. BuyCo is a citizen of Iceland. EP is a citizen of Illinois. The amount in controversy exceeds $75,000.00. Venue is proper in the Eastern District of Wisconsin because the controversy arises out of issues with a construction project and development of a building located in Milwaukee, Wisconsin, that is the sole asset of the Partnership.

On November 9, 2006, the Agreement was executed by the Partnership's partners. Section 17.8 provides that the Agreement and all transactions under the Agreement are to be governed by Delaware law. The purpose of the Partnership is "to acquire land at the corner of Water Street and Juneau Street in downtown Milwaukee, Wisconsin and develop commercial and retail space thereon, a 120–room extended stay hotel and a minimum of eighteen (18) luxury condominiums." (Halloin Aug. 2009 Aff. ¶ 2, Ex. A BuyCo 1141.) At the Partnership's inception, DOC II served as its general partner, and BuyCo, DOC, and EP served as its limited partners.

The Agreement defines "Percentage Interest" as "the percentage interest of a Partner set forth opposite the name of such Partner on Exhibit A, as such percentage may be adjusted from time to time under the terms hereof." (Halloin Aug. 2009 Aff. ¶ 2, Ex. A BuyCo 1140.) Exhibit A of the Agreement reflected the initial percentage interests as follows: (1) BuyCo owned a 60% interest; (2) DOC owned a 20% interest; and, (3) EP owned a 20% interest.

Sections 5.2(a) through (c) of the Agreement, entitled Additional Capital Contributions, state:

(a) The Partners recognize that, in addition to the Capital Contributions, the Partnership may request additional capital from time to time. The Partners shall be requested to contribute additional capital to the Partnership upon the Partners' determination by a vote of the Required Interest that such additional capital is necessary for the Partnership. No Partner shall be required to make any additional contribution to capital. All Partners shall have the right to contribute such additional capital based on their then existing pro rata ownership interest in the Partnership.

(b) If any Partner fails to pay all or any portion of any additional capital contribution requested pursuant to Section 5.2(a) within ten (10) days after written notice of demand, the other Partners shall have the right (i) to make such additional contribution to capital (and as

---

nied by any citation to supporting factual material. In instances where BuyCo has objected to a proposed finding of fact on that ground, the proposed finding of fact has been excluded pursuant to Civil Local Rule 56(b)(2)(B)(ii). In instances that BuyCo has not objected to such a proposed finding of

fact, the Court has deemed it to be uncontroverted. *See* Civil Local Rule 56(b)(4).

Factual statements in briefs that were not included in the proposed findings of fact have been disregarded because they are in violation of Civil Local Rule 56(b)(1)(C) and 56(b)(6).

between them in accordance with the respective pro rata Interests of the Partners that desire to make such contribution) and (ii) as set forth in the foregoing notice of demand, to pro rata increase the respective Percentage Interests of the contributing Partners and to reduce the respective Percentage Interests of the Partners that do not make such contributions. In the event any Partner fails to pay all or any portion of additional capital requested as set forth herein, such Partner shall lose its power to vote on any and all matters.

(c) Exhibit "A" to this Agreement shall be amended to reflect any adjustment in the Percentage Interests of the Partners on account of Capital Contributions made pursuant to this Section.

(Halloin Aug. 2009 Aff. ¶ 2, Ex. A BuyCo 1143.) "Required Interest" is defined as "Partners holding an aggregate of more than sixty-seven percent (67%) of the outstanding Percentage Interests held by all Partners." (*Id.* at Ex. A BuyCo 1140.)

As general partner, DOC II hired STJ, P.C. and Development LLC to perform the construction and project management services necessary to complete the Project. On December 16, 2008, DOC II resigned as the general partner and EP became the general partner.

As of early spring 2009, the Milwaukee Project was not completed. The Milwau-

kee Project has become insolvent, and is in a receivership proceeding that is pending in the Circuit Court for Milwaukee County, Wisconsin under Case No. 2009–CV–9785. Public records indicate that $4,500,000.00 in subcontractor liens have been filed against the Milwaukee Project and that more than $150,000.00 in delinquent tax payments are owed for the Milwaukee Project. There are also thousands of dollars in unpaid public utility bills for the Milwaukee Project.

BuyCo has asserted claims against the Economou Defendants for theft by contractor, recoupment, and fraudulent transfer. The case is pending before this Court and has been consolidated with the declaratory judgment action. EP has counterclaims against BuyCo for a violation of § 17–502 of DRULPA; breach of its duty of good faith and fair dealing; and, breach of fiduciary duty.[23]

BuyCo advanced the initial $7,000,000.00 of capital for the Partnership. The Partnership requested additional equity in excess of $4,000,000.00 in order to enter an October 8, 2008, Forbearance Agreement for its January 9, 2008, loan with SFG.[24] EP, DOC II, and DOC have contributed no capital and have negative capital account balances. (Halloin Aug. 2009 Aff. ¶ 31, Ex. L.)

Section 8.6 of the Agreement reads:

**23.** The Court has modified the factual statement to reflect the dismissal of the counterclaims of STJ, P.C.; Economou Construction; John Economou; Steve Economou; and Thomas Economou.

**24.** There is a factual dispute between the parties as to who contributed the additional equity. BuyCo asserts that the Partnership's financial documents reflect that BuyCo contributed an additional $6.1 in equity, for a total equity contribution of $13.1 million. (*See* Pl.'s Am. PFOF ¶ 24; Halloin Aug. 2009 Aff. ¶ 31, Ex. L.) EP opposes the proposed finding of fact asserting that BuyCo did not

contribute an additional $6.1 million in equity, but rather Askar provided mezzanine financing to the Partnership in the amount of $6.1 million and Askar's own documents reflect that it was a loan not a capital contribution. (*Id.* citing Def.'s Resp. Pl.'s PFOF ¶ 31, citing Economou Sept. 2009 Aff.)

Paragraphs five through 22 of John Economou's Affidavit, beneath the caption "Facts Relating to Capital Contributions and Loans to the Partnership," as well as the documents cited in those paragraphs and exhibits attached thereto raise a genuine issue of material fact as to the source of and nature of the $6.1 million contribution.

Delegation of Certain Activities. The General Partners may delegate to an individual Limited Partner, a single General Partner or an employee of the Partnership any management responsibility or authority, and the General Partner [sic] hereby make and agree to the following delegation of certain activities: (1) Management of Hotel. The Partnership will enter into a management agreement with DOC Hospitality Milwaukee, LLC, or an entity owned fifty percent (50%) or more by [Hugh] for the management of hotel and condominium operations (the "Management Agreement"). The Management Agreement shall provide for a fee equal to five percent (5.0%) of the gross receipts of the hotel, condominium association and rentals from the Project, which amount shall be paid prior to any distributions to Partners, including the Preferred Return. Rental income of any real property owned by the Partnership shall be included in the gross receipts of the Hotel.
(2) Architectural Services/Construction Management Services. The Partnership will enter into an agreement with [STJ, P.C.] for architectural and construction management services. The fee for such services shall be equal to the amount set forth in the budget for the Project and shall be paid prior to any distributions to the Partners.
(3) Development Agreement. The Partnership will enter into a development agreement with [Development LLC] for the development of the Project for a fee equal to that which is set forth in the budget for the Project, which shall be paid prior to any distributions to Partners.

(Halloin Aug. 2009 Aff. ¶ 2, Ex. A.) Pursuant to paragraph 8.6 of the Agreement, the Partnership entered into three subcontracts with EP related entities: 1) a construction management contract with Economou Construction (Economou Sept. 2009 Aff. ¶ 27, Ex. G.); 2) a contract for architectural and engineering work with STJ, P.C. (Economou Sept. 2009 Aff. ¶ 28, Ex. H.); and 3) an Amendment for Agreement Between Owner and Architect with STJ, P.C. (Economou Sept. 2009 Aff. ¶ 29, Ex. I.)

The lender, SFG, forced the Partnership to enter into a forbearance agreement on October 8, 2008. Construction on the Project ceased in December 2008.

### Analysis

Relying on Section 5.2(b) of the Agreement, BuyCo seeks summary judgment declaring that BuyCo's interest in the Partnership is greater than 67%, based on the $13,100,000.00 in equity that BuyCo advanced to the Partnership without any contribution of equity by EP or DOC. Relying upon Section 5.2 of the Agreement, BuyCo requests a finding that EP has lost its voting rights because it failed to contribute additional capital.[25]

In opposing summary judgment, EP relies upon the *Economou* Affidavit and asserts that there are genuine disputes of material facts that preclude summary judgment. EP also asserts that the intent of the Agreement was that BuyCo would be the only partner required to contribute significant cash to the deal and the reason the Project is in financial difficulty relates to BuyCo's failure to provide funds when asked to do so by SFG. EP also maintains that no formal capital call was made because the parties intended the additional

---

**25.** BuyCo raised the same contention with respect to DOC. However, on November 16, 2009, all claims between the Plaintiffs and

DOC were voluntarily dismissed pursuant to a settlement agreement and a *Pierringer* release for this matter. (*See* Docket Nos. 78 & 80).

infusion of $6.1 million to be in the form of a loan and that the additional funds that were paid were not contributed by BuyCo. Instead, the funds were contributed by Askar, which was not a partner. EP states that such funds were intended to cover a shortfall on the bank loan and they were to be repaid once the loan was increased. EP also maintains that Askar received consideration for its contribution in the form of being entitled to a preference on the sales of the condominiums.

■ As required by the Agreement, the Court will apply Delaware law to that Agreement and related transactions. *See Harper,* 743 F.Supp. at 1083. Under Delaware limited partnership law, a limited partnership is a creature of both statute and contract. *Cantor Fitzgerald, L.P.,* 2001 WL 1456494, at *5. The operative document is the limited partnership agreement and the statute merely provides the "fall-back" or default provisions where the partnership agreement is silent. *Id.* Thus, the provisions of the partnership agreement define the rights and responsibilities of those who are parties to the agreement and are afforded significant deference by the courts. *Id.* Only if the partners have not expressly made provisions in their partnership agreement or the agreement is inconsistent with mandatory statutory provisions, will a court look for guidance from the statutory default rules, traditional notions of fiduciary duties, or other extrinsic evidence. *Gotham Partners, L.P.,* 817 A.2d at 170. The Court will also consider the principles of Delaware limited partnership law that it has previously set forth.

Section 17–502 of Title 6 of the Delaware Code address liability of partners in a limited partnership to make a contribution. Section 17–502(b)(2) provides:

> A conditional obligation of a partner to make a contribution or return money or other property to a limited partnership may not be enforced unless the conditions to the obligation have been satisfied or waived as to or by such partner. Conditional obligations include contributions payable upon a discretionary call of a limited partnership or a general partner prior to the time the call occurs.

Section 17–502(c) states:

> A partnership agreement may provide that the interest of any partner who fails to make any contribution that he or she is obligated to make shall be subject to specified penalties for, or specified consequences of, such failure. Such penalty or consequence may take the form of reducing or eliminating the defaulting partner's proportionate interest in the limited partnership, subordinating the partnership interest to that of nondefaulting partners, a forced sale of his or her partnership interest, forfeiture of that partnership interest, the lending by other partners of the amount necessary to meet his or her commitment, a fixing of the value of that partnership interest by appraisal or by formula and redemption or sale of the partnership interest at such value, or other penalty or consequence.

■ The proper construction of a contract is a question of law. *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del. 1992). In analyzing disputes over the language of a contract, the courts give priority to the intention of the parties. *Paul v. Deloitte & Touche, LLP,* 974 A.2d 140, 145 (Del.2009). The starting place is the examination of the four corners of the contract to conclude whether the intent of the parties can be determined from its express language. *Id.* "In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning." *Id.* (quoting *Loril-*

lard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728, 739 (Del.2006); Rhone–Poulenc Basic Chems. Co., 616 A.2d at 1195). Contract language "is not rendered ambiguous simply because the parties in litigation differ concerning its meaning." City Investing Co. Liquidating Trust v. Cont'l Cas. Co., 624 A.2d 1191, 1198 (Del.1993); accord Rhone–Poulenc Basic Chems. Co., 616 A.2d at 1196. Nor, is it rendered ambiguous because the parties "do not agree upon its proper construction." Rhone–Poulenc Basic Chems. Co., 616 A.2d at 1196. A contract is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." Id.

 "Delaware adheres to the 'objective' theory of contracts, meaning a contract's construction should be that which would be understood by an objective reasonable third party." Cantera v. Marriott Senior Living Servs., Inc., No. 16498, 1999 WL 118823, at *4 (Del.Ch. Feb. 18, 1999). Thus, "[c]ontract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del.1997). When terms are not defined in a contract, Delaware courts may rely upon dictionaries in determining the ordinary meaning of contract terms. Lorillard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728, 738 (Del.2006).

### Percentage of BuyCo's Interest

 Although EP asserts that BuyCo was the only partner that was expected to contribute capital, Section 5.2(a) of the Agreement establishes the right of all partners to contribute capital to preserve that partner's relative percentage interest. The provision also states that there is no obligation to advance funds under the Agreement. Thus, the written agreement does not distinguish between the partners—all have the right to make a contribution and none have the obligation to so.

The parties dispute whether the BuyCo made a capital contribution. BuyCo maintains that the "loan v. equity" question is irrelevant. However, BuyCo's position is not supported by the unambiguous terms of the Agreement. Article I of the Agreement defines "capital contribution" as "the total amount of cash and the agreed upon net value of property as determined by a professional appraiser to be contributed by such Partner ... to the capital of the Partnership as Partner's interest." (Halloin Aug. 2009 Aff. ¶ 2, Ex. A BuyCo 1139.) Section 11.7, entitled Loans by Limited Partners, also provides:

[a]ny Partner may make a loan to the Partnership in such amounts, at such times and on such terms and conditions as may be approved by a vote of the Required Interest of the Partners. Loans by any Partner to the Partnership shall not be considered as contributions to the Partnership.

(Halloin Aug. 2009 Aff. ¶ 2, BuyCo 1153.) Thus, the Agreement distinguishes between capital contributions and loans. .

Furthermore, BuyCo has failed to establish that the $6.1 million was an equity contribution from it. EP has submitted evidence indicating that the additional $6.1 came from Askar, and that it was a loan not a capital contribution. Therefore, BuyCo has not established that as a matter of law that it made a $6.1 million equity contribution. Accordingly, BuyCo has not established that it is entitled to summary judgment declaring that it owns in excess of 67% percent of the Partnership.

### Voting Rights of DOC & EP

 BuyCo also seeks a declaration that EP has lost its voting rights under

Section 5.2, because it failed to contribute additional capital, but any such finding presupposes that a proper capital call was made. Since BuyCo has not established that a proper capital call was made, BuyCo has failed to establish that it is entitled to summary judgment in that regard.

### Summary

In conclusion, BuyCo has failed to meet its burden of establishing that it is entitled to judgment as a matter of law. Therefore, its motion for summary judgment on its complaint for declaratory judgment is denied.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

The Economou Defendants' motion for summary judgment dismissing the Plaintiffs' claims against them (Docket No. 105) is **DENIED;**

Pursuant to Fed.R.Civ.P. 41(a)(2), the damages counterclaims of STJ, P.C.; Economou Construction; John Economou; Steve Economou; and Thomas Economou are **DISMISSED.**

The caption of the Case No. 09–C–533 portion of this consolidated action has been **AMENDED** to reflect the dismissal of STJ, P.C.; Economou Construction; John Economou; Steve Economou; and Thomas Economou as counterclaimants.

BuyCo's motion for summary judgment dismissing EP's damages counterclaims (Docket No. 116) is **DENIED;** and

BuyCo's motion for summary judgment filed in the 569 action (Docket No. 25) is **DENIED.**